UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VITO SALADINO and ANNMARIE SALADINO,

                            Plaintiffs,

            -against-

STEWART & STEVENSON SERVICES, INC.,
STEWART & STEVENSON TECHNICAL
SERVICES, INC. and STEWART & STEVENSON
TUG,

                            Defendants.
-------------------------------------------------------------------X
STEWART & STEVENSON SERVICES, INC.,
STEWART & STEVENSON TECHNICAL
SERVICES, INC. and STEWART & STEVENSON
TUG,

                            Third-Party Plaintiffs,

            -against-

AMERICAN AIRLINES, INC.,

                            Third-Party Defendant.
-------------------------------------------------------------------X

**MEMORANDUM and ORDER**

01-CV-7644 (SLT)(JMA)

**TOWNES, United States District Judge:**

        Plaintiffs, Vito Saladino and AnnMarie Saladino (collectively, "Plaintiffs"),[1] bring this

diversity action to recover for injuries Saladino sustained on January 17, 1999, when the

unsecured hood of the baggage tractor in which he was riding as a passenger sprung up and

struck him in the head, rendering him a quadriplegic.  Defendants, Stewart & Stevenson

Services, Inc., Stewart & Stevenson Technical Services, Inc., and Stewart & Stevenson Tug,

---

        [1] Unless otherwise indicated, all references to "Plaintiff" or "Saladino," in the singular, are
references to Mr. Saladino.

LLC (collectively, "S&S" or "Defendants"), which manufactured the baggage tractor at issue, now move for summary judgment dismissing the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND[2]

On or about January 17, 1990, S&S agreed to manufacture and provide baggage tractors to American Airlines ("AA"), and in May 1990, S&S shipped to AA the baggage tractor that has become the subject of this lawsuit. At the time the baggage tractor was delivered to AA, the hood on this model of baggage tractors, known as BT-345, was designed to be secured only by two rubber side latches. However, the subject vehicle was also equipped with a steel cab that covered the driver/passenger area that was an optional piece of equipment for which AA paid extra to be fastened to the baggage tractor.

Due to the design of the hinges on the baggage tractor's hood, the hood could be opened 180 degrees once the two side latches were unlatched. Unlike the baggage tractor here, if a baggage tractor was not equipped with a steel cab, the hood could rotate to the point of entering the driver/passenger area of the vehicle, and possibly strike an individual seated in that area in the head. The BT-345 model of baggage tractors are the only ones manufactured by S&S that, when only standard equipment is installed, permit the hood to enter the driver/passenger area when opened.

---

[2] The following facts are drawn from the affidavits and exhibits, as well as the Local Rule 56.1 statements submitted by the parties. Unless otherwise indicated, the facts are undisputed.

Sometime during the summer of 1990, AA requested that an additional device be installed to secure the hood of the baggage tractor, and S&S installed a center hood latch.[3] The center hood latch was another piece of optional equipment for which AA paid extra to have installed on its baggage tractor. Although there is some confusion as to who designed the center hood latches at S&S, it appears that these devices were installed in a manner contrary to the original plan. As designed, the center hood latches were to be affixed to the underside of the hoods; but when the latches were installed, they were instead attached to the grills of baggage tractors. By installing the center hood latches to the grills, the devices damaged the baggage tractors' radiators. Neither party could locate a baggage tractor with a center hood latch still in use, including the baggage tractor at issue.

From May 1990 onward, the baggage tractor at issue was in the possession of, maintained by, and used by AA. On October 14, 1998, approximately eight years after S&S delivered the baggage tractor to AA, the vehicle was involved in an accident that prompted AA to take it out of service. Because the repairs were expected to take a lengthy amount of time, AA placed a red "out of service" tag on the vehicle's steering wheel. Repairs occurred periodically on the baggage tractor from November 1 to December 17, 1998, during which time AA removed the steel cab, side panels, fenders, and pieces of the side latches to the extent that they were inoperable. Subsequently, AA's repair personnel were unable to locate the baggage tractor, and AA eventually determined that the vehicle had been taken from the repair facility without

---

[3] Plaintiffs also indicate that defendants manufactured a hood guard to address AA's concerns regarding securing the hood of BT-345 baggage tractors, but it is undisputed that a hood guard was never affixed to the baggage tractor at issue.

permission by unknown persons sometime between December 21 - 31, 1998.  The baggage tractor remained missing until January 17, 1999, the date of Saladino's incident.

On January 17, 1999, Saladino was working as a Fleet Service Clerk for AA at John F. Kennedy Int'l Airport ("JFK Airport"), and had been so employed since May 1990.  On the date of his incident, Saladino and a fellow AA employee, Daniel Snow, were assigned to unload luggage from a flight arriving at Gate 31.  Snow went in search of a baggage tractor to use during his shift, as was the customary practice of AA's Fleet Service Clerks, and he located the vehicle at issue near Gate 13.  At this time, the baggage tractor no longer had a red "out of service" tag on its steering wheel, but several components remained missing or non-functional: (1) the steel cab was still missing; (2) one or both of the front side panels of the engine compartment were still missing; (3) the center hood latch was missing; and (4) the two side latches were still inoperable.  In addition, a baggage strap was used to secure the hood of the vehicle.  With the baggage tractor in this condition, Snow drove to Gate 31, with Saladino riding in the passenger seat, to unload luggage for the inbound flight.  Upon completing their task at Gate 31, Snow, with Saladino still riding in the passenger seat, drove across the tarmac and toward an aircraft parked near Gate 10.  Unknown to either Snow or Saladino, the aircraft they were approaching was conducting an engine test, and when Snow drove the baggage tractor behind the aircraft, jet wash from the engine caused the vehicle's hood to lift up and strike Saladino's head.  As a result of the injuries Saladino suffered, he is now a quadriplegic.

In December 2001, Saladino and his wife commenced this action against S&S, alleging five causes of action.  The first cause of action alleges that S&S was negligent in a variety of ways, including "in the design, [and] manufacturing" of the baggage tractor.  Verified Compl.

4

¶ 38.  The second cause of action alleges that the baggage tractor was defective and that S&S is strictly liable.  The third cause of action alleges that S&S breached various express and implied warranties, including warranties that the baggage tractor was merchantable and not defective.  The fourth cause of action alleges that S&S failed to warn AA and Saladino that the baggage tractor was dangerous.  Lastly, the fifth cause of action is Mrs. Saladino's derivative claim for deprivation "of the services, companionship, consortium and society" of her husband as a result of his injuries.  Verified Compl. ¶ 59.  After being sued by the Saladinos, S&S filed a third party complaint against AA for indemnity and/or contribution, and now S&S moves for summary judgment dismissing the complaint in its entirety.

## DISCUSSION

### A.    *The Summary Judgment Standard*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of showing that there is no genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e)*; Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990).  The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts."  *Western World*, 922 F.2d at 121 (internal quotation marks and citations omitted).  Moreover, the non-movant cannot rely on hearsay testimony which would not be admissible if testified to at trial.  *See*, *e.g.*, *Sarno v. Douglas Elliman-*

*Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); FED. R. CIV. P. 56(e). When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**B.     *Jurisdiction and Choice of Laws***

Before addressing the substantive claims on this motion for summary judgment, this Court must determine the basis for its jurisdiction and decide which law to apply in this case. Without specifically addressing the issue, the parties assume that New York law governs this diversity action. This Court, however, is not bound by the parties' assumptions, *see*, *e.g.*, *Kass v. West Bend Co.*, No. 02-CV-3719, 2004 WL 2475606, at *11 (E.D.N.Y. Nov. 4, 2004) (applying New Jersey law despite the parties' assumption that New York law applied), and must, therefore, independently assess which law to apply to this case.

"Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state . . . to decide which state's substantive law governs." *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 175 (2d Cir. 2000). "New York Courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *White v. ABCO Engineering Corp.*, 221 F.3d 293, 301 (2d Cir. 2000). Courts "look only to those facts or contacts that relate to the purpose of the particular laws in conflict," which are, "'almost exclusively, the parties' domiciles and the locus of the tort.'" *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) (quoting *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 480 N.E.2d 679, 684, 491 N.Y.S.2d 90, 95 (1985)).

Here, New York is both Plaintiffs' domicile and the situs of the accident at issue.

Defendants are incorporated in states other than New York, but are alleged to have conducted

business within this state and to have received substantial revenue from that business.

Accordingly, this Court agrees with the parties that it is appropriate to apply New York law in

this case. *See, e.g.*, *Kass*, 2004 WL 2475606, at *11 (applying the law of the state in which the

accident occurred and in which the plaintiffs' resided, even though the defendant was

incorporated and had its main office in other states).

"In New York, a plaintiff injured by an allegedly defective product may seek recovery

against the manufacturer on the basis of any one or more of four theories of liability":  express or

implied breach of contract, negligence, or strict products liability.  *Voss v. Black & Decker Mfg.

Co.*, 59 N.Y.2d 102, 106, 450 N.E.2d 204, 207, 463 N.Y.S.2d 398, 401 (1983).  Here, Plaintiffs

advance all four theories, and Defendants now move for summary judgment as to each theory.[4]

## C.    *Strict Products Liability and Negligence*

"As the law of strict products liability has developed in New York, a plaintiff may assert

that the product is defective because of a mistake in the manufacturing process . . .[,] because of

an improper design . . .[,] or because the manufacturer failed to provide adequate warnings

regarding the use of the product."  *Voss*, 59 N.Y.2d at 106-07, 450 N.E.2d at 207, 463 N.Y.S.2d

---

[4]  Under New York law, Mrs. Saladino's "loss of consortium" claim is premised on the viability of her husband's action, *see Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 508, 239 N.E.2d 897, 903, 293 N.Y.S.2d 305, 312 (1968); *Champagne v. State Farm Mut. Auto. Ins. Co.*, 185 A.D.2d 835, 836-37, 586 N.Y.S. 2d 813, 815-16 (App. Div. 2d Dep't 1992), and although defendants failed to explicitly address this claim in their motion papers, the claim is inextricably intertwined with the claims actually addressed by defendants.  As a result, this Court will treat the "loss of consortium" claim as one properly before it on this motion for summary judgment.  Since Defendants' motion is not granted in its entirety, and some of Plaintiffs' other claims remain, Defendants' motion is denied to the extent it sought to dismiss the "loss of consortium" claim.

at 401; *see also Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d. Cir. 1991). Defendants, believing that Plaintiffs are not seeking to assert a manufacturing defect, address only the defective design and failure-to-warn theories.

Generally, New York courts treat strict products liability and negligence claims as substantively similar. *See Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 255 (1995) ("[T]he strict liability concept of defective design [is] functionally synonymous with the earlier negligence concept of unreasonable designing.") (internal quotation marks and citations omitted; brackets in original); *Enright by Enright v. Eli Lilly & Co.*, 77 N.Y.2d 377, 387, 570 N.E.2d 198, 203, 568 N.Y.S.2d 550, 555 (1991) ("Failure to warn claim . . . though it may be couched in terms of strict liability, is indistinguishable from a negligence claim."). However, the Second Circuit has characterized this aspect of New York products liability as unsettled because the New York Court of Appeals has yet to affirmatively hold that negligence and strict liability have been effectively merged. *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 63 (2d Cir. 2002). Nonetheless, since the Second Circuit has expressed no opinion on how New York's highest court would rule on this issue, this Court will analyze Plaintiffs' negligence and strict products liability claims under a single test. *See, e.g., Barban v. Rheem Textile Sys., Inc.*, No. 01-CV-8475, 2005 WL 387660, at *8 (E.D.N.Y. Feb. 11, 2005) *aff'd*, 147 Fed. Appx. 222, 2005 WL 2759862 (2d Cir. Oct. 26, 2005)*; Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 164-65 (S.D.N.Y. 2003); *G.E. Capital Corp. v. A.O. Smith Corp.*, No. 01 Civ. 1849, 2003 WL 21498901, at *4 (S.D.N.Y. July 1, 2003) (quoting *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 60 (S.D.N.Y. 2001)).

## 1.    *Defective Design*

Before examining the merits of Plaintiffs' defective design claims, the Court will first discuss the governing principles of such a claim under strict liability and negligence, and then analyze Plaintiffs' claims under a single test.  Strict liability defines "[a] defectively designed product [as] one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use." *Scarangella v. Thomas Built Buses, Inc.*, 93 N.Y.2d 655, 659, 717 N.E.2d 679, 681, 695 N.Y.S.2d 520, 522 (1999) (internal quotation marks and citation omitted).  "In order to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss*, 59 N.Y.2d at 107, 450 N.E.2d at 208, 463 N.Y.S.2d at 402.

The issue of whether a "product as marketed was reasonably safe for its intended use is determined by whether a reasonable person with knowledge of the potential for injury of the product and of the available alternatives, balancing the product's risks against its utility and costs and against the risks, utility and cost of the alternatives, would have concluded that it should not have been marketed in the condition that it was." *Cover v. Cohen*, 61 N.Y.2d 261, 266-67, 461 N.E.2d 864, 866, 473 N.Y.S.2d 378, 380 (1984).  In *Voss*, the New York Court of Appeals "identified seven nonexclusive factors to be considered in balancing the risks created by the product's design against its utility and cost."[5]  *Scarangella*, 93 N.Y.2d at 659, 717 N.E.2d at 681,

---

[5]  The seven risk/utility factors identified in *Voss* are:  "(1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product – that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to

695 N.Y.S.2d at 522 (citing *Voss*, 59 N.Y.2d at 109). The *Voss* Court recognized that not all

seven risk/utility factors would be applicable in every case. *Voss*, 59 N.Y.2d at 109, 450 N.E.2d

at 209, 463 N.Y.S.2d at 403 ("Pertinent factors in the individual case, when evaluated as to

whether or not they are applicable, should form the basis for charging the jury"). Rather, the

Court emphasized that the jury was "to decide whether a product was not reasonably safe in light

of all the evidence presented by both the plaintiff and defendant." *Id.* at 108, 450 N.E.2d at 208,

463 N.Y.S.2d at 402. However, the Court also stated that the plaintiff was, "of course, . . . under

an obligation to present evidence that the product, as designed, was not reasonably safe because

there was a substantial likelihood of harm and it was feasible to design the product in a safer

manner." *Id.* Based primarily upon this language in *Voss*, it now appears well established in

New York that in order "to establish a prima facie case based on a design defect, a plaintiff must

offer evidence that it was feasible to design the product in a safer manner and that the proposed

design would have prevented some of plaintiff's injuries." 1A N.Y. Pattern Jury Instructions,

Comment to § 2:141, at 724-25 (3d ed. 2007) (citing cases).

Like a defective design claim under strict liability, a negligent design claim requires that

the plaintiff demonstrate that the product suffers from a defect, "the product defect was a

substantial factor in causing the injury, and that it was feasible to design the product in a safer

manner." *Kosmynka v. Polaris Industries, Inc.*, 462 F.3d 74, 80 (2d Cir. 2006) (internal

quotation marks and citations omitted). In addition to these elements, a negligence cause of

action – unlike one in strict products liability – requires the plaintiff to prove that "the injury

---

have avoided the injury by careful use of the product; (6) the degree of awareness of the potential danger
of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to
spread any cost related to improving the safety of the design." *Voss,* 59 N.Y.2d at 109, 450 N.E.2d at
208-09, 463 N.Y.S.2d at 402-03.

caused by the defect could have been reasonably foreseen by the manufacturer." *Id.* at 86 (citing *Robinson v. Reed-Prentice Div. Of Package Mach. Co.*, 49 N.Y.2d 471, 403 N.E.2d 440, 426 N.Y.S.2d 717 (1980)); *see also Voss*, 59 N.Y.2d at 107, 450 N.E.2d at 207, 463 N.Y.S.2d at 401 ("Strict products liability for design defect thus differs from a cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product"). Since a negligent design claim and a defective design claim under strict liability require proof of the same elements, courts have utilized the risk/utility factors outlined in *Voss* in analyzing both claims. *See Benner*, 214 F.R.D. at 165 (citing *Giunta v. Delta Int'l Mach.*, 300 A.D.2d 350, 353, 751 N.Y.S.2d 512, 515-16 (App. Div. 2d Dep't 2002)).

As stated above, New York courts have treated the differences between negligence and strict liability as inconsequential, *see Barban*, 2005 WL 387660, at *8; *G.E. Capital Corp.*, 2003 WL 21498901, at *4, so this Court will analyze Plaintiffs' negligence and strict liability claims for defective design under a single test. Thus, for Plaintiffs to make out a *prima facie* case for both causes of action, they must show that (1) the product was defectively designed, meaning that the product, as designed, posed a substantial likelihood of harm at the time it was sold; (2) feasible alternatives existed to make the product safer at the time of its design; and (3) the defective product caused plaintiff's injuries. *See Colon*, 199 F. Supp. 2d at 83 (citing *Voss*, 59 N.Y.2d at 107-08, 450 N.E.2d at 208, 463 N.Y.S.2d at 402 and *Fane*, 927 F.2d at 128).

Here, Plaintiffs raise two different theories regarding the defectiveness of the baggage tractor. First, they argue that the hood of the baggage tractor was defectively designed because it was designed to open from front to rear 180 degrees, which easily permitted the hood, once it

was opened, to enter the driver/passenger area, and hit any person who might be sitting in that area. Second, Plaintiffs argue that the devices meant to secure the hood – namely, the center hood latch and the two side latches – were defective. In addition, Plaintiffs argue that many feasible alternative designs existed that could have prevented the hood from injuring Saladino, including a hinge stop that would have prevented the hood from opening a certain distance, such as the devices used on the hoods of cars and trucks that limit those hoods from opening greater than 45 degrees. Finally, Plaintiffs argue that the baggage tractor's defects caused Saladino's injuries.

On this motion, Defendants only attack Plaintiffs' proof of that last element of their *prima facie* case – causation. Without really disputing the defectiveness of their baggage tractor or the availability of feasible alternatives designs, Defendants simply argue that the cause of Saladino's injuries were the result of the baggage tractor being substantially modified by AA.[6] Under New York law, it is well-settled that a "manufacturer will not be liable when a third party substantially modifies its product by disabling or removing a safety feature or guard." *Colon*, 199 F. Supp. 2d at 87 (citing *Robinson*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440). Moreover, "a manufacturer need not incorporate safety features into its products so as to guarantee that no harm will come to every user no matter how careless or even reckless." *Robinson*, 49 N.Y.2d at 480-81, 426 N.Y.S.2d at 721, 403 N.E.2d at 444. Thus, Defendants argue that the removal and disabling of the steel cab, center hood latch, and both side latches by AA substantially modified all four of the baggage tractor's safety devices, and these

---

[6] Because Defendants have not explicitly disputed Plaintiffs' proof of the baggage tractor's defectiveness and the availability of feasible alternatives, this Court finds it unnecessary to "screen" Plaintiffs' experts at this juncture since Plaintiffs' experts have offered testimony primarily upon issues not now before the Court.

modifications were the proximate cause of Saladino's injuries,[7] thereby relieving Defendants of any liability.

However, Plaintiffs dispute that the substantial modification rule even applies to this case, for two reasons:  (1) the devices removed and disabled were not "safety features," as *Robinson* and its progeny have defined the substantial modification doctrine; and (2) the devices removed and disabled fall within the exception to the substantial modification doctrine first recognized in *Lopez v. Precision Papers, Inc.*, 107 A.D.2d 667, 484 N.Y.S.2d 585 (App. Div. 2d Dep't 1985) *aff'd*, 67 N.Y.2d 871, 492 N.E.2d 1214, 501 N.Y.S.2d 798 (1986).

First, Plaintiffs are correct that the relevant case law regarding the substantial modification doctrine requires that the items removed or disabled to be "safety features."  *See Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 185-86 (E.D.N.Y. 2001) ("a third party which work[s] a substantial change in the condition in which the product was sold by destroying the functional utility of a key safety feature . . . are not within the ambit of a manufacturer's responsibility.") (quoting *Robinson*, 49 N.Y.2d at 481, 426 N.Y.S.2d at 721, 403 N.E.2d at 445). According to Plaintiffs, the optional items removed from the baggage tractor (*i.e.*, the steel cab and center hood latch) are not "safety features" because the baggage tractor was designed to operate without them, and defendants did not sell either device as a safety device.  With regard to the two side latches, which Plaintiffs have conceded are standard equipment, Plaintiffs argue that they were only removed or disabled by AA because they failed for their intended purpose.

_____

[7] Plaintiffs attempt to create an issue of material fact by stating that they have only conceded that Saladino's injuries would have been lessened, and maybe prevented, if the steel cab had been left on the baggage tractor.  *See* Plaintiff's Counter Statement of Undisputed Material Facts ("Rule 56.1 Counter Statement") ¶ 33.  The Court is not persuaded that this is a genuine issue since one of Plaintiffs' own experts has testified that the steel cab would have prevented Saladino's injuries.  *See* Deposition of Alfred Harmon ("Harmon Depo."), p. 161.

As an initial matter, Plaintiffs have already conceded that the two side latches were disabled during the time period in which the baggage tractor was designated "out of service," *see* Rule 56.1 Counter Statement ¶ 16, 26, and, therefore, there is no evidence that AA removed or disabled the two side latches from the vehicle at issue because they failed.

In an attempt to support their claim that the steel cab and center hood latch are not safety features or devices, Plaintiffs aver that they have been less than successful in finding any case law dictating what constitutes a "safety feature" under *Robinson*. They claim to have found only one case on point, *Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc.*, No. 99 CIV 4863, 2002 WL 109567 (S.D.N.Y. Jan. 28, 2002). In *Travelers*, a halogen lamp located in the third-party defendant's apartment fell over, igniting a fire on his bed that subsequently spread to other units in the building. After paying out the insurance policies previously issued to the owners of the building and various tenants, Travelers brought a subrogation action against the manufacturer and retailer of the halogen lamp. The manufacturer and the retailer moved for summary judgment, and on that motion, the manufacturer claimed that the retailer substantially modified the halogen lamp by not tightening the setscrews as instructed because the setscrews were a safety feature. Ultimately, the court denied the manufacturer's motion premised on the substantial modification theory because several issues of material fact existed, and for unexplained reasons, the court concluded that the manufacturer's failure to submit evidence that the "setscrew was intended or marked as a safety device" was one of the unresolved material facts. *Id.* at * 5. Although the *Travelers* court seemed to believe that a "safety device" must be so designated by the manufacturer, this Court has located no New York precedent holding that to be the law.

Instead, since the crux of this issue is causation, the Court is more persuaded by New York case law that focuses on the practical effect a modified safety device would have served, meaning a modified device should be considered a safety device if it would have prevented the individual from being injured. *See, e.g., Mackney v. Ford Motor Co., et al.*, 251 A.D.2d 298, 298-99, 673 N.Y.S.2d 718, 719 (App. Div. 2d Dep't 1998) ("It is well settled that a manufacturer of a product may not be held liable for strict products liability or negligence where . . . it is shown that the accident would not have occurred but for the subsequent modification"); *Lovelace v. Ametek, Inc.*, 111 A.D.2d 953, 954, 490 N.Y.S.2d 49, 51 (App. Div. 3rd Dep't 1985) ("It is undisputed that on the occasion of plaintiff's injury, none of the three safety devices designed to protect those running the extractor were operative and, further, that but for want of those devices, the accident would not have occurred.") *app. denied*, 67 N.Y.2d 601, 490 N.E.2d 555, 499 N.Y.S.2d 1026 (1986); *see also Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 238, 700 N.E.2d 303, 305-06, 677 N.Y.S.2d 764, 766-67 (1998) ("A manufacturer is not liable for injuries caused by substantial alterations to the product by a third party that render the product defective or unsafe"); *Amatulli by Amatulli v. Delhi Const. Corp., et al.*, 77 N.Y.2d 525, 531, 571 N.E.2d 645, 649, 569 N.Y.S.2d 337, 341 (1991) (same). Here, defendants have shown that, when delivered to AA, the baggage tractor was in a safe condition, and that if the vehicle had been equipped with some or all of the devices AA removed and disabled, Saladino would not have been injured. Although the parties have agreed that the steel cab was optional equipment and it was not "sold" as a safety device, it is undisputed that it was in fact purchased by AA, installed on the baggage tractor at issue, and would have prevented harm to Plaintiff. Moreover, Plaintiffs' own expert stated that the steel cab would have prevented Plaintiff's injuries if it were

still attached.  *See* Harmon Depo., p. 161.  There may be issues regarding the effectiveness of the center hood latch, but there is evidence that the two side latches would have prevented the subject incident from occurring if these devices were not disabled.  *See* Deposition of Dr. Robert Ehrlich ("Ehrlich Depo."),

pp. 139-40.  Thus, Defendants have demonstrated that, at a minimum, the steel cab and two side latches would have prevented Saladino's injures if they were not removed or disabled, and Plaintiffs have not presented any contrary, admissible evidence.[8]

Similarly, Plaintiffs have not indicated and the Court has not found any New York law that premises a device's status as a "safety feature" upon whether it was offered as optional or standard equipment.  To the contrary, New York law appears to place no significance on whether a safety device is offered as optional or standard equipment.  *See, e.g., Quintanilla v. Komori America Corp.*, No. CV 04-5227, 2007 WL 1309539, at *11 (E.D.N.Y. May 4, 2007); *Scarangella*, 93 N.Y.2d at 661, 695 N.Y.S.2d at 524, 717 N.E.2d at 683; *Beemer v. Deere & Co.*, 17 A.D.3d 1097, 1098, 794 N.Y.S.2d 253, 254-55 (App. Div. 4th Dep't 2005); *Bova v. Caterpillar, Inc.*, 305 A.D.2d 624, 625-26, 761 N.Y.S.2d 85, 87 (App. Div. 2d Dep't 2003). Generally, New York law will not hold a manufacturer liable for failing to include optional safety equipment on its product when the buyer makes an informed decision not to purchase the equipment.  *See Scarangella*, 93 N.Y.2d at 661, 695 N.Y.S.2d at 524, 717 N.E.2d at 683.

---

[8]  Although Plaintiffs offered expert testimony from Alfred Harmon and Dr. Robert Ehrlich that the two side latches were defective, they have not offered any evidence that, if operational, the side latches would not have prevented the subject incident.  Even if Plaintiffs' experts did claim that the side latches were incapable of preventing Plaintiff's incident, since neither expert conducted any tests or performed any calculations regarding the strength of the side latches, the Court need not consider such evidence admissible.  *See Sorto-Romero v. Delta Intern. Machinery Corp.*, No. 05-CV-5172, 2007 WL 2816191, at *5 (E.D.N.Y. Sept. 24, 2007) ("Expert testimony should be excluded if it is 'speculative or conjectural,'") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Although this rule is not relevant here, it does make clear that safety devices, under New York law, can come as standard or optional equipment.

Plaintiffs also contend that defendants are not entitled to relief under the substantial modification doctrine because the *Lopez* exception applies. In *Lopez v. Precision Papers, Inc.*, the Court held that a manufacturer could be liable despite a substantial modification to its product when the product has been designed so that (1) its safety devices are easily removable; (2) removal of the safety devices enhances the product's utility; and (3) the product was purposefully designed to be operated without the safety device. 107 A.D.2d at 669, 484 N.Y.S.2d at 587-88; *see also Colon*, 199 F. Supp. 2d at 88; *Patino v. Lockformer Co.*, 303 A.D.2d 731, 757 N.Y.S.2d 107 (App. Div. 2d Dep't 2003).

Plaintiffs argue that *Lopez* applies here because the baggage tractor was designed to operate without any of the optional equipment (*i.e.,* the center hood latch and steel cab) attached and such equipment was easily removable. However, Plaintiffs have presented no evidence that removing these devices enhanced the utility of the vehicle, *see Barnes v. Pine Tree Machinery*, 261 A.D.2d 295, 691 N.Y.S.2d 398 (App. Div. 1st Dep't 1999), and regarding AA's disabling of the two side latches, Plaintiffs have not come forth with any evidence to even suggest that the baggage tractor was purposefully designed to operate without them or that the baggage tractor's utility was increased by their removal. *See Patino*, 303 A.D.2d at 732, 757 N.Y.S.2d at 109. Plaintiffs' argument is further complicated by the fact that no rational jury could find that the baggage tractor at issue was not substantially modified since, prior to Saladino's incident, AA had taken the vehicle out of service and had begun extensive repairs to it after it had been damaged. *See Lopez*, 107 A.D.2d at 669, 484 N.Y.S.2d at 587 (describing the rationale behind

*Robinson*'s holding by stating, "Under no view of the facts could one conclude that the modification was intended either for versatility of functioning or for ease of cleaning.").

Thus, this Court finds that the doctrine of substantial modification precludes Plaintiffs from establishing a *prima facie* case in either strict liability or in negligence, as those claims relate to a defective design theory of liability. Accordingly, Defendants' motion is granted in this respect.

### 2.   *Failure to Warn*

Plaintiffs also seek to hold defendants liable under negligence and strict liability for Defendants' failure to provide adequate warnings.[9] Under New York law, "[a] manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Liriano*, 92 N.Y.2d at 237, 700 N.E.2d at 305, 677 N.Y.S.2d at 766 (quoting *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297, 591 N.E.2d 222, 582 N.Y.S.2d 373 (1992)). A plaintiff must show a breach of that duty, and "that the failure to warn was the proximate cause of his [or her] injury." *Henry v. Rehab Plus Inc.,* 404 F. Supp. 2d 435, 442 (E.D.N.Y. 2005); *see Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974, 530 N.E.2d 1280, 1281, 534 N.Y.S.2d 360, 361 (1988). Thus, to make out a *prima facie* case in negligence and strict liability, a plaintiff asserting a failure to warn claim must establish that (1) the manufacturer had a duty to warn, meaning it knew, or should have known, of latent dangers resulting from intended or reasonably foreseeable unintended uses of the product; (2) the plaintiff used the product in a reasonably foreseeable manner; and (3) the manufacturer's failure

---

[9] The doctrine of substantial modification is not applicable to failure to warn claims, especially when the allegation is that the manufacturer failed to warn that the product, as modified, may be dangerous, *see Colon*, 199 F. Supp. 2d at 87 (citing *Liriano v. Hobart Corp.*, 92 N.Y.2d at 240, 677 N.Y.S.2d 764, 700 N.E.2d 303), which is the thrust of Plaintiffs' allegation here.

to provide a warning was the cause of plaintiff's harm. *See Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 485-86 (S.D.N.Y. 2004); *Clarke v. LR Systems*, 219 F. Supp. 2d 323, 329-30 (E.D.N.Y. 2002); *Liriano*, 92 N.Y.2d at 237, 700 N.E.2d at 305, 677 N.Y.S.2d at 766 .

Plaintiffs, without much specificity, essentially allege that Defendants had a duty to provide a warning regarding the dangerousness of operating the baggage tractor while its hood was unsecured, and Defendants' failure to provide any warning caused Plaintiff's injuries. However, "[i]n duty to warn cases, New York recognizes two circumstances that would preclude a finding of proximate cause:  obviousness and the knowledgeable user." *Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir.), *vacated on other grounds sub nom., New York State Dep't of Health v. Andrulonis*, 502 U.S. 801, *and reinstated following remand*, 952 F.2d 652 (2d Cir. 1991); *see also Colon*, 199 F. Supp. 2d at 85 (quoting *Hutton v. Globe Hoist Co.*, 158 F. Supp. 2d 371, 376 (S.D.N.Y. 2001)); *Liriano*, 92 N.Y.2d at 241, 700 N.E.2d at 308, 677 N.Y.S.2d at 769.  Without clearly stating which theory they believe relieves them of liability, Defendants argue that Plaintiff had actual knowledge of the specific danger that harmed him, and that a warning would have been superfluous given the circumstances of Plaintiff's incident.  In particular, Defendants argue that Plaintiff knew he could be struck by the baggage tractor's opening hood on January 17, 1999, because he was aware of three other facts, namely that (1) jet wash could move objects, (2) jet wash could open an unlatched baggage tractor hood, and (3) a hood, when opened, could reach the driver/passenger area of vehicle.  Plaintiff's actual knowledge, according to Defendants, establishes that even if an adequate warning were provided, it would not have prevented Plaintiff from entering the baggage tractor and suffering

his injuries.  The Court construes this argument as one for relief under the obviousness

exception.

In *Liriano*, the court explained that the obviousness exception would relieve a

manufacturer of liability, in certain situations:

> [W]here the injured party was fully aware of the hazard through
> general knowledge, observation or common sense, or participated
> in the removal of the safety device whose purpose is obvious, lack
> of a warning about that danger may well obviate the failure to
> warn as a legal cause of an injury resulting from that danger.
> Thus, in appropriate cases, courts could as a matter of law decide
> that a manufacturer's warning would have been superfluous given
> an injured party's actual knowledge of the specific hazard that
> caused the injury.

*Liriano*, 92 N.Y.2d at 241, 700 N.E.2d at 308, 677 N.Y.S.2d at 769; *see also Colon*, 199 F. Supp.

2d at 92-93.  However, the obviousness exception "generally should not apply when there are

aspects of the hazard which are concealed or not reasonably apparent to the user."  *Liriano*, 92

N.Y.2d at 242, 700 N.E.2d at 308, 677 N.Y.S.2d at 769.  In addition, under New York law, a

manufacturer must also rebut the presumption that a warning, if provided, would have been

heeded by the injured individual.  *See Santoro*, 340 F. Supp. 2d at 486 (citing *Anderson v.

Hedstrom Corp.*, 76 F. Supp. 2d 422, 441-45 (S.D.N.Y. 1999) (discussing case law related to the

presumption)).  This presumption may be rebutted by specific facts showing that the warning

would have been futile.  *Id.*

As an initial matter, Defendants have failed to sustain their burden on this motion of

establishing that there are no genuine issues of material fact.  The crux of Defendants' defense to

Plaintiffs' failure to warn claim is that the hazard that injured Plaintiff was obvious, yet Plaintiffs

have adequately disputed the allegation that Plaintiff knew that the vehicle's hood could open

180 degrees and enter the driver/passenger area. *See* Rule 56.1 Counter Statement ¶ 40;

Deposition of Vito Saladino ("Saladino Depo."), p. 77. In fact, Plaintiff and Snow, the driver of

the baggage tractor, testified that they thought the hood of the baggage tractor would stop before

entering the driver/passenger area of the vehicle. *See* Rule 56.1 Counter Statement ¶¶ 40, 41;

Saladino Depo., p. 77; Deposition of Daniel Snow ("Snow Depo."), p. 238. Defendants appear

to misapprehend Plaintiff's testimony regarding his knowledge of how the hinges on the hood

operated:

> Q [by Defendants' counsel]: Were you told during that training
> period that if the hood was not latched down, the jetwash could
> cause the hood to move?
> A [by Saladino]: Yes.
> Q: What were you told about the manner in which jetwash [sic]
> could cause the hood on the [baggage] tractor to move if it wasn't
> latched down?
> A: That it would blow off.
> Q: Were you also told that it could blow back toward the

operator?

> A: Yes.
> Q: What were you told about the possibility of the hood blowing
> back due to jetwash [sic]?
> A: Like I said, you could get hurt.
> Q: You were told that if you drove the [baggage] tractor too close,
> jetwash [sic] could cause the hood to blow back and hurt you?
> A: Yes.

Saladino Depo., pp. 72-73. This exchange is less than clear, but Plaintiff appears to be

discussing the possibility of jet wash causing the hood to fly off its hinges, not simply rotate

open. However, the import of Plaintiff's testimony is made clearer when he is subsequently

asked, "What do you mean by the hood would open?" He explicitly responds, "It would open

halfway and then stop." Saladino Depo., p. 77. Given the uncertain, and at best disputed, nature

of Plaintiff's knowledge regarding the operation of the hood's hinges, Defendants are not entitled to summary judgment on their "obviousness" defense.

In addition, the Court finds that Defendants have failed to submit sufficient evidence to rebut the presumption that Plaintiff would have heeded a warning, if given, or that a warning would have been superfluous. Defendants simply claim that Plaintiff did not examine the vehicle before entering it, and, therefore, was unaware that the side latches were inoperable, and would similarly fail to appreciate a warning if given. Such proof falls short of satisfying the burden placed upon Defendants, and given the testimony from Plaintiff and Snow that they thought the hood would stop short of opening a full 180 degrees, it would not be unreasonable for a jury to conclude that the absence of a warning caused Plaintiff's injuries. *See Sorto-Romero*, 2007 WL 2816191, at *11-12; *Montufar v. Shiva Automation Serv.*, 256 A.D.2d 607, 608, 683 N.Y.S.2d 125, 125 (App. Div. 2d Dep't 1998). Accordingly, Defendants' motion for summary judgment is denied with respect to Plaintiffs' failure to warn claims.

**D.      *Breach of Express and Implied Warranties***

Finally, Defendants seek summary judgment on Plaintiffs' claims for breach of both express and implied warranties. Defendants argue that the breach of warranty claims are time barred by Section 2-725 of New York's Uniform Commercial Code, which sets a four-year statute of limitations period for breach of warranty claims. Plaintiffs offer nothing in response. Section 2-725 states, in part:

> (1) *An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.* By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

> (2) *A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made*, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.Y. U.C.C. § 2-725 (McKinney's 2007) (emphasis supplied). New York law is clear that breach of warranty claims accrue when the manufacturer tenders delivery of the product to the initial purchaser. *See Barban*, 2005 WL 387660, at *10; *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 410-11, 477 N.E.2d 434, 435-36, 488 N.Y.S.2d 132, 133-34 (1985). Moreover, such claims are subject to a four-year statute of limitations even when the product was delivered to the injured party's employer instead of to him or her directly. *See Kern v. Frye Copysystems, Inc.*, 878 F. Supp. 660 (S.D.N.Y. 1995); *Koss v. Leach Co.*, 6 A.D.3d 665, 776 N.Y.S.2d 590 (App. Div. 2d Dep't 2004); *Vanata v. Delta Intern. Machine Corp.*, 269 A.D.2d 175, 702 N.Y.S.2d 293 (App. Div. 1st Dep't 2000).

Here, it is undisputed that Defendants delivered the baggage tractor to AA in May 1990, thereby requiring a timely breach of warranty claim to be made sometime in May 1994. Plaintiffs' action was not commenced until December 2001, well after the applicable statute of limitations period had expired. In addition, Plaintiffs' failure to address the timeliness of these claims in their memorandum of law indicates to this Court that these claims are abandoned. *See Sorto-Romero*, 2007 WL 2816191, at *9 (collecting cases). Accordingly, Defendants' motion for summary judgment is granted in this respect, and Plaintiffs' breach of warranties claims are dismissed.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted with respect to Plaintiffs' breach of warranty claims, as is so much of Plaintiffs' strict products liability and negligence claims that assert a defective design. However, Defendants' motion is denied with respect to Plaintiffs' failure to warn claims whether asserted in strict liability or negligence, as is Plaintiffs' derivative claim for "loss of consortium."

SO ORDERED.

Dated: Brooklyn, New York
          November 30, 2007

*Sandra L. Townes*

SANDRA L. TOWNES
United States District Judge