UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
Vito Saladino and AnnMarie Saladino,
                    Plaintiffs,

    - against -

Stewart & Stevenson Services, Inc.,
Stewart & Stevenson Technical
Services, Inc., Stewart & Stevenson
Tug,
                  Defendants.
------------------------------------X
Stewart & Stevenson Services, Inc.,
Stewart & Stevenson Technical
Services, Inc., Stewart & Stevenson
Tug,
      Third-Party Plaintiffs,

    - against -

American Airlines, Inc.,
      Third-Party Defendant.
------------------------------------X

01-CV-7644 (SLT)(SMG)

**MEMORANDUM
OPINION AND ORDER**

**TOWNES, United States District Judge.**

Plaintiffs, Vito Saladino and AnnMarie Saladino
(collectively, "plaintiffs"),[1] bring this diversity action to
recover for injuries Saladino sustained on January 17, 1999, when
the unsecured hood of the baggage tractor in which he was riding
as a passenger sprung up and struck him in the head, rendering
him a quadriplegic. Defendants, Stewart & Stevenson Services,
Inc., Stewart & Stevenson Technical Services, Inc., and Stewart &
Stevenson Tug, LLC (collectively, "S & S"), manufactured the
baggage tractor at issue. S&S impleaded third party defendant
American Airlines ("AA"), who was Saladino's employer at the time

---

[1] Unless otherwise indicated, all references to "plaintiff" or
"Saladino." in the singular, are references to Mr. Saladino.

of his injuries, alleging that AA's negligence was a contributing cause of plaintiff's injuries.

Plaintiffs' failure to warn claim and derivative loss of consortium claim were tried before a jury between November 12 and November 26, 2008. Although the jury found Saladino negligent, it did not find him to be a substantial factor in the accident and assigned him no fault. The jury assigned S&S 30% of the fault and assigned AA 70% of the fault. Now before this Court are (1) S&S' motion for a directed verdict and/or a judgment not withstanding the verdict and (2) AA's motion for judgment as a matter of law. For the reasons set forth below, the motions are denied and the jury's verdict is affirmed.

## BACKGROUND

*Factual History*

### *The BT-345 Baggage Tractor*

The BT-345 baggage tractor ("the BT-345" or "the tractor") at issue here was manufactured by S&S for AA. (Ex. P 54).[2] The hood on this model of baggage tractors was designed to be secured by two rubber side latches, but the latches were never tested for wind resistance or strength. (Tr. 368, 582).[3] The subject vehicle was also equipped with a steel cab that covered the

---

[2]  "Ex." refers to the exhibits admitted at trial. A "P" notation before the exhibit number refers to plaintiffs' exhibit and a "D" notation before the exhibit number refers to defendants' exhibit.

[3]  "Tr." refers to the trial transcript.

driver/passenger area. (Tr. 574, 590, 736-738). The cab was optional and could be removed at any time. (Tr. 590). There was no center hood latch originally designed for the BT-345. (Tr. 575).

Due to the design of the hinges on the baggage tractor's hood, the hood could open 180 degrees once the two side latches were unlatched. (Tr. 572, 738-39, 743-44). If a baggage tractor was not equipped with a steel cab, the hood could enter the driver/passenger area of the vehicle, and strike an individual seated in that area. *Id.* There is no design reason why the hood rotates 180 degrees. (Tr. 587-89). S&S knew that hinges or hinge stops could be constructed in such a way as to restrict the range of motion of the hood. (Tr. 572-73, 935).

*AA Orders Tractors from S&S Subject to Modifications*

On July 14, 1989, AA engineer David Ward prepared an evaluation of three BT-345 model tractors AA was using at Dallas Forth Worth Airport, and recommended that S&S be added to AA's approved vendor list subject to S&S making 15 modifications to these tractors. (Ex. P 41A-B). The purpose of the evaluation was to notify S&S that these tractors needed additional safety and mechanical features. (Tr. 932-33, 937). One such modification was the addition of hood stops to prevent the hood of the tractor from striking a driver's head if it was blown open by jet wash or if the hood latches were damaged. (Ex. P 41A-B).

S&S wrote an internal memorandum in response to the AA modification request acknowledging that tractors sent to AA needed to have a mechanism to limit the range of the hood. (Ex. P 54; Tr. 950). There is no indication that such a modification was ever made to the tractors. (Tr. 577).

In January 1990, AA ordered and received 10 BT-345 tractors without cabs from S&S. (Ex. P 40B). Appended to this order was a list of terms and conditions, one of which stated that the tractors include "hood stops to prevent hood from striking operator." *Id.* Hood stops were not installed on these tractors. (Tr. 577). Four of these tractors were designated for John F. Kennedy Int'l Airport ("JFK Airport" or "JFK"). Cabs were subsequently ordered for these tractors in March 1990. (Ex. P 40B). The cabs were installed on the tractors. *Id.*

There were no warnings in the instruction manual, on the cabs or on the tractor not to remove the cabs. (Tr. 243-44). There were no signs that the cabs were safety devices. *Id.* There was no training on the purpose of the cabs or safety bulletins about the dangers of using a tractor without its cabs. (Tr. 590-91).

Originally, there was no center hood latch on the tractor. (Tr. 575). In December 1989 and again in February 1990, Mr. Ward, a senior AA engineer, requested that S&S install an additional device to secure the hood of all future baggage

tractors in order to keep the hood latched in the event that the side latches were not properly secured. (Ex. P 54 pp. 9, 17). In July 1990, S&S shipped "hood latch assemblies for BT-345 bag tractors" to AA in Dallas. (Ex. P 54 p. 30). Ward confirmed that center hood latches were requested. (Tr. 348). But, there was no testimony or any documentation at trial to show that the center hood latches were ever installed.[4]

Plaintiff and Mr. Snow[5] understood that the BT-345 hood hinges were like hinges on a car hood and allowed the hood of the tractor to "open halfway and stop." (Tr. 319, 545-46). At the time of the accident, approximately 20-25% of the tractors operated by AA had hoods. (Tr. 441). Plaintiff saw other tractors whose cabs were removed yet remained in operation. *Id.*

*The McCary Accident: S&S and AA had Knowledge that BT-345 Hoods Open and Injure Personnel*

On October 26, 1989, Nathan McCary, a fleet service clerk at Dallas Fort Worth Airport, was driving an S&S BT-345 tractor behind Gate 34. (Ex. P 39A, B). Both of the hood latches were

---

[4] In its statement of facts, S&S says that, pursuant to exhibit P 54, it "installed a third latching mechanism in the center of the [t]ractor's hood." (S&S Mot. Directed Verdict p. 3). However, as stated, there was no testimony or any documentation offered at trial to corroborate this point. In addition, exhibit P 54 states that Ward requested installation of the center hood latches. However, S&S did not install the center hood latches on at least some of the units because it shipped hood latch assemblies to AA. (Ex. P 54 p. 30). And, the fact that the request is included in the purchase order is not dispositive of S&S following the instruction. AA also requested hood stops to prevent the hood from striking the tractor operator. (Ex. P 54 p. 14). But, hood stops were not installed on any of the tractors. (Tr. 577).

[5] Mr. Snow drove the cab when the accident occurred.

disengaged. *Id.* When the tractor drove behind a running jet engine, the hood blew back and struck Mr. McCary in the head. *Id.* An investigation by AA concluded that, "because the new [S&S BT-345] bag tractors have a manual hood locking mechanism, [AA should] suggest that we have [S&S] modify these vehicles to prevent the hoods from opening to such an extent that they contact the personnel operating them." *Id.* The investigation report wanted automatic latches installed and cables or chains to be affixed to the underside of the hood to prevent the hood "from opening to such an extreme." *Id.*

In 1991, Mr. McCary sued S&S alleging failure to warn and negligent design claims. *Id.* The petition notified S&S that when Mr. McCary "was driving one of the tugs or tractors, a sudden blast of air from a jet engine caught the hood and blew it up, striking [Mr. McCary] in the head and rendering him unconscious." *Id.*

*The BT-345 Tractor is Damaged and Disappears*

On October 14, 1998, the subject tractor was involved in an accident in which the cab was damaged. (Tr. 217-18). Due to the amount of damage sustained in the accident, the maintenance team decided to refurbish the tractor. (Tr. 219-20). The steel cab, engine panels and several other parts of the tractor were removed. (Tr. 227-28). The maintenance team ordered a new cab and additional parts from S&S. (Tr. 255).

Because the refurbishment was expected to proceed over a protracted period of time, AA placed a tag on the steering wheel of the tractor advising operators not to use it and removed the Port Authority license plates ("PONY plates"). (Tr. 220-21, 230-31). AA mechanics removed the ignition coil and parked the tractor outside Hangar 10. (Tr. 220, 226). The coil was replaced during each repair, and because the tractors had no individual keys, anyone could start the tractor when the coil was present. (Tr. 226-27, 264). No boot was placed on the vehicle to prevent anyone from driving it before the repairs were completed. (Tr. 302).

During the course of the repairs, a metal crossbar was affixed to the back of the tractor in order to raise the rear lights so they could be seen. (Tr. 250). The hood latches were believed to be inoperable, but they were not removed or altered. (Tr. 228).

In December 1998, the tractor disappeared from the maintenance shop. (Tr. 229- 233). A search was mounted for the vehicle, but it was not located. (Tr. 230). According to AA mechanics, the baggage tractor remained missing until January 17, 1999, the date of Saladino's incident. (Tr. 229, 232-33).

At some point prior to Mr. Saladino's accident, AA employee Daniel Snow, another fleet service clerk, began using the tractor in question which he had, "just gotten ... from freight." (Tr.

329). There was a PONY plate on the hood. (Tr. 230). There was also a registration sticker from "unit LC-2488" on the hood. (Tr. 309). There were no out-of-service tags or any warnings on the vehicle that it was not fit for use. (Tr. 347). Mr. Snow used it approximately twelve times prior to the day of Mr. Saladino's accident. (Tr. 328).

*The Engine Test*

On January 17, 1999, Robert Needham and Anthony Korovich, AA aircraft mechanics, conducted an engine test on an aircraft parked at Gate 10 because of a fuel leak in the aircraft's left engine. (Tr. 829, 831, 833-34). Needham, the crew chief, ordered a "walk-around" of the aircraft while he headed to the cockpit. (Tr. 829). Korovich walked around the aircraft to ensure no one was close enough to get hurt. (Tr. 887-88). Korovich did not have a wand with him during his walk-around. *Id.* Needham told the operators of the vans and conveyor belts near the aircraft to move back, past the wing tips. (Tr. 834-36). Needham then went into the cockpit alone and performed the run-up by turning the engine on to approximately 23% thrust, the highest thrust allowed at a gate. (Tr. 836, 843-44).

Any plane with a running engine should have beacon or strobe lights on to warn personnel that jet engines are running. (Tr. 339-40, 529). Needham and Korovich testified that the aircraft's

beacon and wing strobe lights were on. (Tr. 861, 896).[6]

During an engine start or run-up at the gate, AA's procedures require someone be positioned behind the wing tip and wave a wand in the air so that anyone driving in the vicinity of tested aircraft would know that the engine is running. (Tr. 1106-07). Wands are used to warn of procedures in the gate area to move personnel out of harm's way. (Tr. 694-96). They are hot pink in color and can be seen from a distance. *Id.* During engine run-ups at a gate, personnel clear a 100-foot danger zone. (Tr. 858). There were no AA personnel assigned to stand near the wings of the plane with wands during the run-up that night. (Tr. 687, 841).

*The Accident*

Also on January 17, 1999, Saladino was working as a Fleet Service Clerk for AA at JFK Airport. (Tr. 428-29). Mr. Snow used the subject tractor to perform his duties for his entire shift. (Tr. 320-21). Snow and Saladino completed their shift and used the BT-345 tractor to drive back to the locker room so they could clock out for the day. (Tr. 538).

Snow, with Saladino in the passenger seat, drove at approximately 15 to 20 miles per hour across the tarmac, and behind the aircraft parked at Gate 10. (Tr. 323-24). Snow drove

---

[6] Snow testified that the aircraft's beacon and strobe lights were not on.

the vehicle approximate 20 to 30 feet behind the tail of the aircraft. (Tr. 325). Snow observed that the aircraft door was open and that there were vehicles near the aircraft. (Tr. 321-23). He did not see any lights or beacons on the aircraft nor did he see anyone with wands or lights to direct traffic. (Tr. 324, 326). He believed the engine was off because he did not hear any engine sounds. (Tr. 325).

Unbeknownst to Snow and Saladino, AA personnel were conducting an engine test on that aircraft at Gate 10. *Id.* As the tractor came around the aircraft, Snow "heard an explosion," passed out and woke up with Saladino's head in his lap. (Tr. 325-27). Saladino was unconscious and unresponsive. (Tr. 327).

*The State of the BT-345 Tractor at the Time of the Accident*

At the time of the accident, the tractor did not have a center hood latch, fenders or one side-hood panel. (Tr. 347-48). The post-accident report stated that the headlights, taillights, steering, front and rear ends, tires and brakes were in good condition. (Tr. 267). Photographs taken after the accident show that the side latches were worn and dilapidated, but present on the vehicle. (Ex. P 40N). One latch was attached to a leather tie-down strap. *Id.* The side latches were, according to Snow, usable before the accident. (Tr. 329). Snow sometimes noticed that the hood was unlatched and "re-latch[ed] the [side latches] before [he] used the vehicle." *Id.*

Many AA tractors were in poor condition. (Tr. 349, 441-42, 546). There was no indication that this tractor was in worse shape than the rest. (Tr. 441 42). Approximately one half of the tractors in service had broken or missing hood latches, none of which, to Mr. Saladino's knowledge, were ever taken out of service. (Tr. 441, 444-45).

*Saladino's Knowledge*

At the time he was hired, Saladino received two weeks of formal training on the safe use of baggage tractors. (Tr. 471, 474-75, 511-12). There were also continuous monthly training sessions, during which he learned that it was important to keep baggage tractors away from running jet engines. (Tr. 475). He was instructed on the importance of securing a tractor's side hood latches. (Tr. 480-81). He knew there was a risk that a tractor's hood would not be kept down if the latches were not functional. (Tr. 481-82). Saladino could distinguish between operational and non-operational latches. (Tr. 441-42).

Saladino received training on the dangers he might encounter in the gate area, including jet wash. (Tr. 485, 488, 556-57). He did not believe that fleet service clerks worked in an area where there was enough jet blast to cause a tractor hood to blow off a vehicle; only on a runway where the engine was running at

its full capacity could that happen.[7]  (Tr. 485, 488, 547-48, 553-54, 556).  Saladino believed that even if a hood flew off a vehicle, only passersby, not vehicle operators or vehicle passengers, could be injured.  (Tr. 486-87).  Based on his experience with tractors, he believed the hood could not rotate into the passenger compartment.  (Tr. 450-51, 484, 515).  He believed that if the hood was blown back by jet wash, it would "open halfway then stop."  (Tr. 545).  As a result of his training, Saladino understood that the hood would open to "a 45 degree angle and come to a stop like all the other tractors would at the airport that I saw."  (Tr. 546).

Snow was trained on the dangers of driving a tractor with an unlatched hood.  (Tr. 317-18).  He was trained to inspect a baggage tractor before using it.  (Tr. 344).  He knew through "common sense" that unlatched hoods could blow open by either a "gust of wind or a jet engine."  (Tr. 318).  Snow testified that on the "two or three" occasions where the hood blew open from the force of wind, the hood would come halfway up because the hinges on the hoods of the baggage tractors were "like regular car hinges ... [which] only go[] up so far."  (Tr. 319).  Like Saladino, Snow believed the hinges would prevent the hood from hitting him.  (Tr. 330).

---

[7]  AA mechanic Korovich testified that jet wash that occurred during an engine run-up at the gate was a "strong wind" but that it would "absolutely not" be strong enough to knock a pedestrian to the ground.  (Tr. 885-86).

*Procedural History*

In December 2001, Saladino and his wife commenced this action against S & S, alleging design defect, breach of warranty and failure to warn claims on behalf of Vito Saladino and a derivative claim for loss of services on behalf of Annmarie. S&S impleaded AA as a third party defendant asserting claims for common law indemnification and contribution. AA asserted a counterclaim against S&S for indemnification and contribution.

In December 2006, S&S moved for summary judgment to dismiss the complaint. On November 30, 2007, this Court granted partial summary judgment in favor of S&S and dismissed plaintiffs' design defect and breach of warranty claims. The failure to warn claim and derivative loss of consortium claim remained for trial.

In July 2008, the Court ordered the liability phase of the trial bifurcated from the damages phase. The trial on liability commenced, before a jury and this Court, on November 10, 2008. Both S&S and AA made motions for a directed verdict during the trial. The Court reserved decision on the motions. The Court delivered the jury's verdict on November 26, 2008. The jury found S&S liable and apportioned S&S 30% of the liability and AA 70% of the liability. The jury determined that plaintiff was negligent but that his negligence did not proximately cause the accident and therefore did not apportion any liability to him.

Following the jury verdict, the instant motions were filed.

## DISCUSSION

Under Federal Rule of Civil Procedure 50, if a party files a motion for judgment as a matter of law after an adversary has been fully heard on an issue during trial, and the court does not grant the motion, the party may renew the motion no later than 10 days after the entry of judgment. Fed.R.Civ.P. 50(a)-(b). Once a motion has been renewed,

> the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

Fed.R.Civ.P. 50(b). "In assessing whether judgment as a matter of law is proper, the court must view all of the evidence and draw all inferences in the light most favorable to the non-moving party." *Norville v. Staten Island University Hospital*, 196 F.3d 89, 95 (2d Cir.1999). However, "[t]he court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 43 (2d Cir.2002) (internal quotation marks and citation omitted). Judgment as a matter of law should be granted "only when ... there can be but one conclusion as to the verdict that reasonable [people] could have reached." *Weldy v. Piedmont Airlines*, 985 F.2d 57, 59-60 (2d Cir.1993) (internal quotation marks and citation omitted).

The S&S and AA defendants argue that plaintiffs failed to prove a *prima facie* failure to warn claim because (1) plaintiffs

failed to establish that S&S had a duty to warn; (2) plaintiffs failed to prove that Saladino used the tractor in a reasonably foreseeable manner; and (3) the jury's determination that plaintiff's negligence was not a substantial factor/proximate cause is against the weight of the evidence and warrants at least a new trial on apportionment of liability or in the alternative a new trial as to liability. S&S defendants also argue that (4) plaintiffs failed to prove that S&S's failure to provide a warning caused the accident. AA defendants further argue that (5) a new trial is warranted because plaintiffs improperly offered evidence of a design defect and of AA's negligence.

*Failure to Warn*

"A failure to warn claimant must demonstrate that (1) a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of the harm." *Santoro ex rel. Santoro v. Donnelly*, 340 F.Supp.2d 464, 485 (S.D.N.Y. 2004).

In New York, failure to warn claims are identical under strict liability and negligence theories of recovery. *Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 439 (S.D.N.Y. 1999). "A product may be defective when...it is not accompanied by adequate warnings for use of the product. A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of

its product of which it knew or should have known. A
manufacturer also has a duty to warn of the danger of unintended
uses of a product provided these uses are reasonably
foreseeable." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 700
N.E.2d 303, 305 (1998). "In duty to warn cases, New York
recognizes two circumstances that would preclude a finding of
proximate cause: obviousness and the knowledgeable user."
*Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir. 1991),
*vacated on other grounds sub nom. New York State Dep't of Health
v. Andrulonis*, 502 U.S. 801, *and reinstated following remand*, 952
F.2d 652 (2d Cir.1991); *see also Hutton v. Globe Hoist Co.*, 158
F.Supp.2d 371, 376 (S.D.N.Y.2001). Warnings are not required if
the danger is open and obvious or if the plaintiff was aware of
the risk. *Liriano*, 92 N.Y.2d 232.

S&S had a duty to warn Saladino of the latent danger posed
by the BT-345 hood's ability to flip back 180 degrees because
Saladino used the tractor in a foreseeable manner. The danger
posed by the hood's rotation was not obvious and Saladino was not
a knowledgeable user.

*S&S and AA Knew the Hood Was a Latent Danger*

The BT-345 had a latent danger, i.e., the danger posed by
the hood's rotation was not open or obvious to a reasonable
person. That danger was that the tractor's hood opened 180
degrees into the driver/passenger compartment of the tractor. It

was not apparent that the hood could rotate 180 degree. In addition, according to Snow, no other baggage tractors used by AA had hoods that opened 180 degrees. The other baggage tractors had hoods that, like hoods on cars, were somehow prevented from opening 180 degrees. There was no evidence presented at trial that AA personnel could tell a hood's degree of rotation by visual inspection.

S&S and AA knew that the hood was dangerous. In 1989, two weeks after AA received the first shipment of BT-345 baggage tractors from S&S, AA sent S&S an engineering report ordering addition tractors on the condition that S&S alter the tractors to ensure the safety of the personnel using the tractors. The requested alterations included hood stops to prevent the hoods from flipping back 180 degrees and a center hood latch to keep the hood secure in the event that the side latches are inoperable or improperly secured. In addition, the McCary accident and subsequent litigation alerted both S&S and AA that jet wash could cause the hood to open 180 degrees and injure personnel.

*Use of the Tractor in its Altered State Was Foreseeable*

Use of the tractor in its altered condition was reasonably foreseeable. Many AA baggage tractors were used in a dilapidated state, and there was no indication that this tractor was in worse shape than the rest. Although external pieces of the tractor were missing, there was a PONY plate on the tractor's

hood. Headlights, taillights, steering, front and rear ends, tires and brakes were in good condition. The side latches were worn and dilapidated, but present on the vehicle. According to Snow, the side latches were operable prior to the accident. Saladino testified that approximately one half of the tractors in service had broken or missing hood latches, none of which were ever taken out of service. A reasonable jury could conclude that AA personnel regularly used tractors that were not in perfect condition and that it was foreseeable that this tractor could also be used in its imperfect condition because it was in no worse shape than other baggage tractors.

*Saladino Was Not a Knowledgeable User*

Saladino was not a knowledgeable user because he was not aware that the hood could open 180 degrees. Saladino was trained on the use of baggage tractors at the beginning of his employment with AA in addition to receiving monthly safety training. During his tenure with AA, Saladino used baggage tractors in the course of performing his duties at JFK.

While this showing amply demonstrates that plaintiff is knowledgeable in the operation of baggage tractors, it is insufficient to demonstrate that the knowledgeable user exception applies in this case. "[T]he knowledgeable user exception applies only where the user is actually aware of the precise danger involved." *Andrulonis*, 924 F.2d at 1223. Indeed, the

user must not only know of the particular risk he or she faces, but must also be aware of the severity of the potential harm. *See Donald v. Shinn Fu Co.*, No. 99-CV-6397 (ARR), 2002 WL 32068351, at *9 (E.D.N.Y. Sept. 4, 2002) *(citing Billiar v. Minnesota Mining & Mfg. Co.*, 623 F.2d 240, 244 (2d Cir.1980)).

There was no evidence adduced at trial that the plaintiff was specifically trained that, if there was no cab on a BT-345 tractor, the hood could rotate 180 degrees into the passenger compartment of the tractor, hitting someone on the head and causing such extreme damage as to render a person quadriplegic. Saladino was aware that the hood could fly off the tractor, but not flip back. Because he was not aware of the particular risk or of the severity of the potential harm, Saladino was not a knowledgeable user.

*Failure to Warn Caused the Harm*

A plaintiff must show a breach of the duty to warn and "that the failure to warn was the proximate cause of his [or her] injury." *Henry v. Rehab Plus Inc.*, 404 F.Supp.2d 435, 442 (E.D.N.Y.2005); *see Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974, 530 N.E.2d 1280, 1281, 534 N.Y.S.2d 360, 361 (1988). As explained above, the hood's rotation was a latent harm and Saladino used the tractor in a reasonably foreseeable manner. In addition, S&S knew or should have known of the danger and Saladino was not a knowledgeable user. Therefore, S&S had a duty

to warn.

There was enough evidence adduced at trial for a reasonable jury to determine that Saladino would have heeded such a warning had he known of the possibility of this type of harm. Under New York law, a manufacturer must rebut the presumption that a warning, if provided, would have been heeded by the injured individual. See *Santoro*, 340 F.Supp.2d at 486 (citing *Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 441-45 (S.D.N.Y.1999) (discussing case law related to the presumption)). This presumption is rebutted by specific facts showing that the warning would have been futile. *Id.* No such facts were presented.

The only evidence offered as to whether Saladino would have heeded a warning is from Saladino's own testimony where he states that he would have heeded such a warning had one been given. (Tr. 471). The jury credited his statement and determined that S&S had a duty to warn of the hood's danger.

*Saladino's Negligence Was Not a Proximate Cause*

The jury found Saladino negligent but did not apportion any responsibility to him for the accident. S&S and AA argue that such a determination is against the weight of the evidence. The issue of whether a plaintiff's negligence was a proximate cause of an accident is separate and distinct from the negligence determination. *Forlastro ex rel. Estate of Forlastro v. Collins*,

No. 07 CV 3288, 2008 WL 2791277 at *4 (S.D.N.Y. 2008). "A [plaintiff] may act negligently without that negligence constituting a proximate cause of the accident. In order to find that [plaintiff's] negligence was a proximate cause of the harm caused, the jury must find that the negligence was a substantial factor in bringing about the injury. There may be one, or more than one, substantial factor." *Id*.

Here, the jury determined that Saladino was negligent in riding the tractor. However, they determined, and the evidence shows, that because Saladino could not foresee the specific injury he suffered, his actions were not a proximate cause of the harm. *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 125 (2d Cir. 1996); *see also Bailey v. Seaboard Barge Corp.*, 385 F.Supp. 310, 315 (the substantial factor/proximate cause test is "whether the harm which occurred was of the same genre as the foreseeable risk created by the [actor's] negligence") (*quoting County of Westchester v. Town of Greenwich, Conn.*, 870 F.Supp. 496 (S.D.N.Y. 1994)). Based upon the evidence, the jury was entitled to conclude that although the plaintiff, S&S and AA behaved in a negligent manner, S&S and AA's conduct alone were the only substantial factors in bringing about the injury.

*Improper Evidence Was Sustained and Did Not Prejudice the Jury or Harm American Airlines*

AA argues that plaintiffs improperly offered evidence

relating to the tractor's design defect and AA's negligence. The
design defect claim was dismissed by this Court on summary
judgment, and plaintiff is precluded from suing AA by New York
Workers' Compensation Laws. Some of the evidence which AA claims
pertains to the design defect, specifically evidence of AA's
request that the tractor be modified with hood stops, a center
hood latch and passenger cab, to improve safety, was admissible
at trial to show that S&S knew that the hood posed a latent
danger.

At times, plaintiffs' attorney tried to offer evidence that
pertained only to the dismissed design defect claim. During
trial, the Court cautioned plaintiffs' counsel against offering
evidence pertaining solely to claims that were not being tried.
The Court prevented prejudice by sustaining objections to the
improper evidence and instructing the jury to disregard evidence
subsequently stricken on the basis of a sustained objection. *See*
*generally Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct.
3102, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury
will follow an instruction to disregard inadmissible evidence
inadvertently presented to it, unless there is an overwhelming
probability that the jury will be unable to follow the court's
instructions.") (internal quotation marks and citation omitted);
*accord Brown v. Schultz*, No. 03 Civ. 3320, 2006 WL 156983, at *11
("There is no reason to believe that the jury in this case did

not disregard the stricken testimony and commentary as contemporaneously instructed by the trial judge."). AA also argues that plaintiffs should have been precluded from offering evidence of AA's negligence because New York's Workers' Compensation Statute precludes an employee from directly suing his employer for a work related accident. AA argues that evidence of its negligence was irrelevant to plaintiffs' failure to warn claims. This Court initially limited plaintiffs' submission of evidence of AA's negligence to what Saladino observed during the accident. (Tr. 1252). The Court then reversed itself and allowed plaintiffs to offer evidence of AA's negligence because S&S asserted an affirmative defense that AA's negligence was a proximate cause of the accident. (Tr. 1259). S&S impleaded AA pursuant to N.Y. Workers' Compensation Law § 11 because Saladino sustained a "grave injury," specifically quadriplegia. N.Y Workers' Compensation Law § 11. However, the statute does not preclude a plaintiff from offering evidence against the third-party defendant employer.[8] And, in any event, allowing such evidence during plaintiffs' case was, if error, harmless. If plaintiffs had not offered the evidence, the S&S

---

[8] AA also argues that allowing plaintiffs to offer evidence of AA's negligence is akin to allowing plaintiffs to recover directly against AA. This is not correct. Plaintiffs sued the S&S defendants. Therefore, as this Court instructed the jury, plaintiffs may only recover against the S&S defendants. (Tr. 1411-17). The jury was instructed that the S&S defendants may recover against AA only if AA's actions or lack there of were a proximate cause of the accident. (Tr. 1412-13, 1417).

defendants would have introduced it while arguing their affirmative defense because the evidence was necessary for the jury to properly apportion liability.

## CONCLUSION

For the reasons set forth above, the jury's verdict is affirmed and the motions for a directed verdict, judgment not withstanding the verdict and judgment as a matter of law are denied. The parties are directed to schedule a settlement conference before the Magistrate Judge and to prepare for the trial on damages.

The Clerk is directed to transmit a copy of the within to the parties and the Magistrate Judge.

SO ORDERED.

Dated :    Brooklyn, New York
           March 28, 2010


                                   s/ SLT
                              United States District Judge