FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 2 6 2011 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
VITO SALADINO and ANNMARIE SALADINO,

                Plaintiffs,

-against-

STEWART & STEVENSON SERVICES, INC.,
STEWART & STEVENSON TECHNICAL
SERVICES, INC. and STEWART & STEVENSON
TUG,

                Defendants.
-----------------------------------------------------------------X
STEWART & STEVENSON SERVICES, INC.,
STEWART & STEVENSON TECHNICAL
SERVICES, INC. and STEWART & STEVENSON
TUG,

                Third-Party Plaintiffs,

-against-

AMERICAN AIRLINES, INC.,

                Third-Party Defendant.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

01-CV-7644 (SLT) (JMA)

**TOWNES, United States District Judge:**

      Plaintiffs Vito and AnnMarie Saladino brought this diversity action against defendants Stewart & Stevenson Services, Inc., Stewart & Stevenson Technical Services, Inc., and Stewart & Stevenson Tug, LLC (collectively, "S&S") to recover for injuries Mr. Saladino sustained on January 17, 1999, when the unsecured hood of a baggage tractor struck him in the head, rendering him a quadriplegic. S&S impleded third party defendant American Airlines, Inc. ("AA"), who was Mr. Saladino's employer at the time of the incident, alleging that AA's negligence was a contributing cause of Mr. Saladino's injuries. Following the damages phase of

the trial, a jury awarded Mr. Saladino (1) $5 million for past pain and suffering; (2) $10 million for future pain and suffering; (3) $4,908,108.20 for past health care expenses; (4) $18 million for future health care expenses; (5) $532,309 for lost earnings; (6) $1 million for loss of future earnings; and Mrs. Saladino (7) $750,000 for loss of consortium.

S&S and AA have moved, pursuant to Federal Rule of Civil Procedure 59, for an order granting a new trial on damages unless Plaintiffs accept a remittitur as to certain jury findings. Specifically, AA contests the awards for (1) pain and suffering; (2) future medical expenses; and (3) loss of consortium. AA also claims that a new trial is warranted due to allegedly improper summation comments by Plaintiffs' counsel. S&S contests only the pain and suffering awards. For the reasons that follow, Defendants' motions for a new trial are denied on all grounds.

## I. BACKROUND

On January 17, 1999, Mr. Saladino and another AA employee, Daniel Snow, were assigned to unload luggage from an arriving flight at John F. Kennedy International Airport. Mr. Snow drove the baggage tractor with Mr. Saladino riding in the passenger seat. Although the baggage tractor no longer displayed an "out of service" tag, several components related to securing the hood remained missing or non-functional. After they unloaded the baggage, the two men drove away to clock-out for the end of their shift, unaware that a nearby aircraft was conducting an engine test. As they passed it, jet wash from the engine caused the baggage tractor's hood to lift up and strike Mr. Saladino's head. When Mr. Snow awoke, he found Mr. Saladino unconscious and unresponsive. Due to his severe injuries, Mr. Saladino is now a quadriplegic.

On November 16, 2001, Mr. and Mrs. Saladino filed a complaint against S&S alleging various theories of liability for Mr. Saldino's injuries and a derivative claim for loss of consortium. On March 14, 2002, S&S filed a third party complaint against AA for indemnification and/or contribution. This Court bifurcated the liability and damages phases of the trial, and the first phase was tried before a jury in November 2008. Although the jury found Mr. Saladino in part negligent, it did not find him to be a substantial factor in the accident. The jury assigned 30 percent of the fault to S&S and 70 percent to AA.

On July 26, 2010, after the subsequent damages trial, the jury awarded, inter alia, Mr. Saladino $15 million for past and future pain and suffering and $18 million for future health care expenses, as well as $750,000 to Mrs. Saladino for loss of consortium. Defendants claim that parts of the award deviate materially from reasonable compensation and move this Court to grant a new trial unless Plaintiffs stipulate to a substantial reduction. As noted, AA also moves for a new trial based upon allegedly improper summation comments by Plaintiffs' counsel.

## II. DISCUSSION

### A. Damages Awards Claims

Rule 59 provides that a court "may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Second Circuit has held that when a trial court finds a jury award excessive, it has the discretion, "pursuant to the practice of remittitur, [to] condition the denial of a motion for a new trial on the plaintiff's acceptance of a reduced amount in damages." Dwyer v. Deutsche Lufthansa, AG, 686 F. Supp. 2d 216, 218 (E.D.N.Y. 2010)

(citing Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 165 (2d Cir. 1998)). Although the practice of remittitur minimizes judicial interference in the jury's domain, "[a] trial court must be careful not to disturb a jury's award unless it is excessive, because calculation of damages is the province of the jury, and damages need not be proved with mathematical certainty." Okraynets v. Met. Transp. Auth., 555 F. Supp. 2d 420, 434 (S.D.N.Y. 2008).

To determine whether the verdict is excessive, and therefore appropriate for remittitur, a trial court sitting in diversity must apply the substantive State law. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 437 n.22 (1996) ("Whether damages are excessive for the claim-in-suit must be governed by some law. And there is no candidate for that governance other than the law that gives rise to the claim for relief – here, the law of New York."). In this case, the relevant New York statute provides:

> In reviewing a money judgment . . . in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

N.Y. C.P.L.R. § 5501(c) (emphasis added). A reviewing court must therefore look to comparable verdicts in similar New York cases to evaluate the reasonableness of a jury award. Dwyer, 686 F. Supp. 2d at 219. Indeed, the exercise "is not optional but a legislative mandate" and courts "cannot . . . attempt to use the rationale of deference to a jury verdict in resolving that issue when we are supposed to compare analogous verdicts." Donlon v. City of New York, 284 A.D.2d 13, 16 (1st Dep't 2001).[1] For the reasons below, this Court concludes that the damages awarded in this case do not warrant remittitur.

---

[1] In terms of later review, "the standard for federal appellate evaluation of a district court's application of [§ 5501(c)] is review for abuse of discretion." Marcoux v. Farm Service and

4

## 1. Pain and Suffering Damages

Both federal and state courts have long acknowledged that, in contrast to economic damages, awards for pain and suffering "do not lend themselves as easily to computation," In re Joint Eastern and Southern Dist. Asbestos Litig., 9 F. Supp. 2d 307, 311 (S.D.N.Y. 1998), and a precise measure is simply "impossible," Braun v. Ahmed, 127 A.D.2d 418, 424 (2nd Dep't 1987). In truth, "[a]ssigning dollar amounts to pain and suffering is an inherently subjective determination." Marcoux, 290 F. Supp. 2d at 478.

### a. Life Before and After the Accident

Mr. Saladino was born on August 22, 1962, in Brooklyn New York. (Tr. 59). He spent his teenage years working in his father's deli, and later opened his own produce and garment businesses. (Tr. 59, 61). In 1987, at the age of 25, he married AnnMarie and the couple had two daughters. (Tr. 62, 64). During this period, Mr. Saladino left his own businesses and took a position as a fleet service clerk at American Airlines, allowing him to spend more time with his family. (Tr. 61-62, 64). On a typical day, he worked an early shift, picked up his older daughter from school, helped with homework, cooked dinner, and prepared the girls for bed while Mrs. Saladino worked as a receptionist for a medical practice during the evening. (Tr. 65-66). Mr. Saladino often took his daughters to the park and the family went on excursions to pick pumpkins, strawberries, and apples, as well as to amusement parks. (Tr. 66-67). He also kept a garden in the backyard, where his daughters helped him plant vegetables. (Tr. 67). Before the children were born, Mr. and Mrs. Saladino traveled to the Caribbean, Niagara Falls, Mystic, the Jersey Shore, and Long Island. (Tr. 67). They took the children to Disneyworld and to the beach in the summertime. (Tr. 67).

---

Supplies, Inc., 290 F. Supp. 2d 457, 475 n.11 (S.D.N.Y. 2003) (citing Gasperini, 518 U.S. at 438).

Mr. Saladino has no memory of January 17, 1999, the day he was injured. (Tr. 68). He awoke in a hospital bed, "scared," tubes running from his body and feeling completely "numb. I had no feeling nowhere . . . . I felt my head and that was it." (Tr. 68-69). The last event he remembered was his sister-in-law's wedding, which took place in November 1998. (Tr. 68). At Jamaica hospital, doctors surgically fused his spine with bone from his hip and screwed a "halo" brace to his skull which he wore for three months to prevent his head from moving. (Tr. 69, 73). He then spent four months at a rehabilitation center "to learn how to live as a quadriplegic." (Tr. 70). During this period, Mr. Saladino experienced multiple complications, including high fevers, allergic reactions to antibiotics, as well pressure ulcers on his lower back and ankles, which required extensive surgery and necessitated more hospitalization. (Tr. 70-72). He also suffered from constant urinary tract infections. (Tr. 74). He has feeling only above his collar bone and at the top of his shoulders, and was able move his shoulders and biceps. (Tr. 74). He cannot open or close his fingers, has no movement in his wrists, and operates his electric wheelchair by leaning on a joystick. (Tr. 76). There has been no improvement for Mr. Saladino; the range of motion in his neck has actually decreased. (Tr. 75).

Mrs. Saladino describes her husband as a "wonderful" father, who used to help with all aspects of childcare. (Tr. 380). He also was handy enough to do many of the repairs on their home. (Tr. 382). After the accident, the family had to relocate for six months while the house was altered to accommodate Mr. Saladino's disabilities. (Tr. 387). In the meantime, Mrs. Saladino was trained at the rehabilitation center to care for her husband, including the routines for catheterization and manual stool evacuation, and how to move him around. (Tr. 387). Mrs. Saladino left work for more than two years, first to be with her husband at the hospital, and then

to care for him at home. (Tr. 388). As soon as their younger daughter started first grade, she returned to work part-time. (Tr. 388).

When Mr. Saladino arrived home, he was quiet and devastated. (Tr. 389). The injuries deeply affected the marriage. The family had support in the house 24-hours a day, but Mrs. Saladino testified that it was "hard to have a family life if there's always somebody . . . there watching you." (Tr. 390). During the first year, Mr. Saladino felt "humiliated" having nurses attend to the intimate parts of his care, so his wife performed all the catheterizations and bowel routines. (Tr. 391). During attempts to socialize out of the house, Mr. Saladino sometimes had accidents with his catheter. (Tr. 391). The man "that was able to everything . . . all of a sudden [was] limited to nothing almost." (Tr. 392). Mrs. Saladino managed all household chores, childcare responsibilities, and work outside the home. (Tr. 392-93). The couple's intimate physical relations were non-existent. (Tr. 393). Ultimately, they came to the decision that Mr. Saladino should leave the house because they were "arguing a lot and it started affecting the children, . . . [who] started pulling away from him a little bit." (Tr. 394). Mr. Saladino decided that "since [his] kids have lived . . . their whole life in the house," he would move out so "there wouldn't have to be so much adversity between us." (Tr. 176). He continues to maintain contact with his family, calling every day, seeing the children during the week, and attending birthdays, graduations, and recitals when possible. (Tr. 176-77). But the marriage is over. Mr. and Mrs. Saladino permanently separated in 2008. (Tr. 395).

### b. Mr. Saladino's Daily Routine

Mr. Saladino currently has 16 hours of nurse care and eight hours of health aid care per day. (Tr. 180). He wakes up at approximately 6 a.m. with the night aid turning him to his back

7

and moving his limbs through a range of motions for at least an hour. (Tr. 171). At 8 a.m., Mr. Saladino's first nurse arrives, takes his vital signs, changes his catheter, bathes him in the bed, and feeds him breakfast. (Tr. 172). To maintain his level of health, Mr. Saladino has changed his diet significantly; he drinks a gallon of water a day and has accomplished the difficult goal of losing weight, controlling his diabetes, which developed as a result of his injuries. (Tr. 183, 279).

After breakfast, the nurse performs range of motion exercises for another hour before dressing Mr. Saladino and placing him in his wheelchair. (Tr. 172). From 11:30 a.m. to 4 p.m., Mr. Saladino typically uses a voice-activated computer, watches TV, or the nurse drives him to do errands. (Tr. 173, 179). Often, to pass the idle time, he simply counts the objects in front of him. (Tr. 173). From 4 p.m. to midnight, the second nurse makes dinner and Mr. Saladino watches more TV or takes a ride to the stores or beach before the nurse prepares him for bed. (Tr. 173). At the beach, Mr. Saladino typically must stay in the air-conditioned van because he cannot regulate his own body temperature. (Tr. 214, 266-67). Mr. Saladino is also unable to control his bladder function, so that he is incontinent and predisposed to "urinary tract infections, the development of kidney stones or bladder stones and then kidney failure." (Tr. 267). Additionally, every second night the nurse manually clears Mr. Saladino's bowels before performing further range of motion exercises and changing his catheter. (Tr. 173-74). Mr. Saladino testified that whether "I fall asleep or not, I will wake up, whatever I do." (Tr. 174). The health aid arrives at midnight and the routine begins again. (Tr. 180).

In addition to monitoring of his sugar level, observing his skin integrity, and turning his body every two hours to avoid pressure ulcers, a major area of concern for Mr. Saladino is

dysreflexia, a sudden and unpredictable spike in blood pressure that can cause stroke, heart attack, or death. (Tr. 181, 182). As Mr. Saladino's treating physician, Dr. Adam Stein, explained, dysreflexia is "a very unusual condition and it's only a condition that occurs in some patients with spinal cord injury." (Tr. 265). According to Dr. Stein, "some noxious thing . . . affect[s] the patient, but because the patient can't feel," it goes unnoticed, which then "sets off a reflex reaction in the body characterized by . . . potentially extremely high blood pressure, extremely low heart rate, . . . flushing of the skin and sweating and stuffy nose," and is "usually accompanied by a quite severe headache." (Tr. 266). As noted, if not treated properly, dysreflexia "can lead to brain hemorrhage, seizure, stroke," heart attack, and death. (Tr. 266). The nurses attending Mr. Saladino must therefore address signs of dysreflexia immediately, sometimes applying a "nitro paste" to an area of skin above the level of injury. (Tr. 181-82). Mr. Saladino has also been hospitalized for pancreatitis and other complications.

c. **Excessiveness Analysis**

Both AA and S&S contend that the jury award for past and future pain and suffering is excessive under § 5501(c) based on a review New York state cases and because – despite Mr. Saladino's extensive paralysis and numerous related conditions – the record does not establish that he suffers from physical pain. (See AA Mem. at 1; S&S Mem. at 4). It is worth noting, however, that prior awards are considered "not binding but instructive" for courts engaged in a § 5501(c) analysis. Asbestos Litig., 9 F. Supp. 2d at 311. "Moreover, the standard under § 5501(c) is not whether an award deviates at all from past awards – it is whether an award deviates materially from reasonable compensation." Okraynets, 555 F. Supp. 2d at 439 (emphasis in original). The role of the court is not to "ascertain an 'average' award based on

9

comparable cases," but to "assess what amount is the 'highest amount of compensation allowable,' based on the evidence." Id. (citing Kirschhoffer v. Van Dyke, 173 A.D.2d 7, 11 (3rd Dep't 1991)).

Defendants are of course correct that a federal court sitting in diversity and applying § 5501(c) must "look to awards in comparable cases." Dwyer, 686 F. Supp. 2d at 219; see also Gasperini, 518 U.S. at 437 n.22. They have, however, cited no persuasive authority for the proposition that a federal court engaged in a § 5501(c) review may consider awards only in a particular appellate department. (AA Mem. at 7-8).[2] That state court judges have perhaps admonished parties for relying on cases in different departments is of no moment. Although a federal court has noted that "[i]f at all possible, cases within the relevant venue should be relied upon," the court actually began the same passage by stating that "[s]imilar injuries or diagnoses are primary . . . criteria in choosing sufficiently analogous cases." Geressy v. Digital Equipment Corp., 980 F. Supp. 640, 657 (E.D.N.Y. 1997) (emphasis added). Even a cursory examination of recent federal cases involving § 5501(c) analysis reveals consistent review of state court awards from multiple New York venues. See, e.g., Adebiyi v. Yankee Fiber Control, Inc., 705 F. Supp. 2d 287, 295-96 (S.D.N.Y. 2010) (considering awards in first, second, third, and fourth departments); Dwyer, 686 F. Supp. 2d at 219-20 (considering awards in first, second, third, and fourth departments); Okraynets, 555 F. Supp. 2d at 438-42 (considering awards in first, second,

---

[2] AA's most recent filing, which refers this Court to a 2008 Eleventh Circuit decision is also misguided, not only because the case does not involve New York law, but also because it does not specifically stand for the proposition put forth in Part II.B of AA's motion. (See letter to the Court from AA, dated Sept. 30, 2010 (citing Bravo v. United States, 532 F.3d 1154 (11th Cir. 2008)). Indeed, in denying a rehearing in that case, the Eleventh Circuit noted that "[w]e considered every award excessiveness decision from every District Court of Appeal that was cited to us or that we could find." Bravo, 583 F.3d 1297, 1298 (11th Cir. 2009). Even if AA meant to assert more generally that this Court should review only published state appellate decisions, Bravo, which involves the application of Florida law, has no bearing on this case.

third, and fourth departments); Godfrey v. Soto, No. 06-CV-428 (NG) (JO), 2007 WL 2693652, at *5 (E.D.N.Y. Sept. 10, 2007) (considering awards in first, second, and third departments); Gissinger v. Yung, Nos. CV-04-0534, 04-5406 (BMC) (JO), 2007 WL 2228153, at *6 (E.D.N.Y. July 31, 2007) (considering awards in first, second, and fourth departments); Marcoux, 290 F. Supp. 2d at 477-78 (considering awards in first, third, and fourth departments). Accordingly, this Court has reviewed various cases that involve jury awards to plaintiffs who, like Mr. Saladino, have suffered significant paralysis.

In several recent cases, New York courts have sustained pain and suffering awards to paralysis victims of at least $10 million and up to $17.5 million. As noted, this Court is "not trying to ascertain an average award based on comparable cases," but instead is trying "to assess what amount is the highest amount of compensation allowable based on the evidence, that would not deviate materially from reasonable compensation." Okraynets, 555 F. Supp. 2d at 439 (quotation marks omitted). For instance, in Tenuto v. Lederle Laboratories, No. 1134/81, 2010 WL 625223 (N.Y. Sup. Feb. 17, 2010) (Table),[3] the trial court sustained an aggregate pain and suffering award of $17.5 million to a plaintiff who contracted contact polio from his infant daughter after she received a vaccination. As with Mr. Saladino, Mr. Tenuto's injuries "cost him his job, his marriage, and the loss of enjoyment of life. He lives in a small handicapped accessible apartment [and] uses a wheelchair to get around." Id. at *16. The court sustained the award in part because Mr. Tenuto had waited 30 years for his day in court. Mr. Saladino was

---

[3] "It is well established that the language [of § 5501(c)], although specifically directed to the appellate courts, also applies to the trial court." Miraglia v. H & L Holding Corp., 799 N.Y.S.2d 162 (N.Y. Sup. 2010) (Table). Federal courts have frequently considered state trial court decisions, in addition to appellate decisions, as part of a § 5501(c) review. See, e.g., Adebiyi, 705 F. Supp. 2d at 295 (finding New York Supreme Court decision "particularly instructive"); Marcoux, 290 F. Supp. 2d at 477-78 (reviewing multiple New York Supreme Court decisions). In Tenuto, the appellant actually withdrew its appeal of the trial court decision. No. 2010-03383, 2010 WL 3326018 (1st Dep't Aug. 25, 2010).

injured nearly 11 years ago and has a life expectancy of 24 years. While the polio rendered Mr. Tenuto a permanent paraplegic, Mr. Saladino's injuries have left him a quadriplegic incapable of caring for himself in any way. Accordingly, the Court finds that an aggregate award of $15 million for Mr. Saladino, which is less than the award to Mr. Tenuto, is not excessive.

Another paralysis case, Miraglia, 799 N.Y.S.2d 162, involved a 45-year-old construction worker who became a paraplegic after suffering injuries when he fell into a trench and became impaled on a rebar. Mr. Maglia suffered chronic and permanent nerve pain in his legs, bed sores, catheterization, inability to control his bowel movements, constant urinary tract infections, repeated hospitalizations, and distress at losing the ability to walk. The appellate division found that Mr. Miraglia's award should be reduced to $5 million for past and $5 million for future (35 years) pain and suffering, for a total of $10 million. Miraglia, 36 A.D.3d 456, 456 (1st Dep't 2007). Defendants argue that Mr. Miraglia's physical pain was more significant than Mr. Saladino's and that he was expected to live eleven years longer. (AA Mem. at 23). Mr. Saladino, however, has far more extensive paralysis.

In Bissell v. Town of Amherst, 56 A.D.3d 1144 (4th Dep't 2008), the court approved $3 million for approximately five years of past pain and suffering and $7 million for 32.7 years of future pain and suffering for a plaintiff who experienced incontinence, sexual dysfunction, chronic excruciating pain, and had no motor function below his knees. Defendants again seem to argue that pain trumps greater paralysis as a general principle. This Court is unconvinced. From the facts included in the state court's opinion, it appears that Mr. Bissell has remained with his wife, who continued to manage his care. In contrast, Mr. Saladino's more significant paralysis

prevents him from aiding in his own treatment and has led to his departure from the family home and the dissolution of his marriage.

The plaintiff in Ruby v. Budget Rent-A-Car Corp., 23 A.D.3d 257 (1st Dep't 2005), was rendered a paraplegic at the age of 25, suffering complications like chronic pain, incontinence, psychological effects, and loss of sexual function. The appellate court reduced the jury award to $2 million for past pain and suffering and $8 million for future pain and suffering, based on a life expectancy of 44.6 years. Although Mr. Ruby has a longer period for future damages, his level of paralysis is less than that of Mr. Saladino and Mr. Ruby's own experts conceded that he was capable of working in a reduced capacity in the future. (Id. at 258).

In Okraynets, 555 F. Supp. 2d 420, the court considered damages for a carpenter who was injured when he fell from a wall and equipment landed on him. He was rendered a paraplegic and suffered from infection, incontinence, chronic pain, loss of sexual function, and other associated conditions, some requiring surgery. He must use a wheelchair and perform self-catheterization and bowel disimpactation multiple times a day. The court reduced the jury award to an aggregate of $10.5 million, based in part on a life expectancy of 39 years. Again, it is important to note that Okraynets involves a case of paraplegia, not quadriplegia, and the plaintiff in that case was physically able to manage some of his own care.

In sum, a review of these New York cases leads this Court to conclude that $15 million for pain and suffering does not deviate materially from reasonable compensation. Having little cognitive deficit, Mr. Saladino has complete understanding of his near-total physical limitations and is "keenly aware of what aspects of [his] past enjoyment of life are foreclosed in the future." Coniker v. State, No. 86901, 2002 WL 32068270, at *23 (N.Y. Ct. Cl. Dec. 23, 2002) (citing

McDougald v. Garber, 73 N.Y.2d 246 (1989)). He is essentially a prisoner in his own body, dependant on others for every moment of his day, including the performance of his most basic bodily functions. Despite his commitment to a proactive and 24-hour health regime, Mr. Saladino still faces unpredictable threats of dysreflexia, infections, and other complications. He has lost his marriage, his home, and his livelihood, sometimes spending hours each day counting objects in front of him just to pass the time. The Court rejects Defendants' attempts to straightjacket the § 5501(c) analysis into a "Sophie's choice" of whether a person would trade pain for mobility. Therefore, although the $15 million aggregate pain and suffering award is certainly in the higher range, this Court does not find the amount excessive as a matter of law.

### 2. Loss of Consortium Claim

AA also argues that the jury's award of $750,000 for Mrs. Saladino's lost consortium claim deviates materially from reasonable compensation under § 5501(c). This type of claim is "derivative to the extent that it is premised on the harm flowing to a spouse from the plaintiff's injuries," but it is also "an independent claim . . . and must be separately proved." Gissinger, 2007 WL 2228153, at *7 (citing Sherry v. North Colonie Central School District, 39 A.D.3d 986 (3rd Dep't 2007)). "Under New York law, consortium (i.e., services and society) represents each marital partner's interest in the continuance of the marital relationship as it existed at the inception of the marriage." Okraynets, 555 F. Supp. 2d at 440 (citing Consorti v. Owens-Corning Fiberglas Corp., 86 N.Y.2d 449, 450 (1995)).

As a preliminary matter, the parties in this case have stipulated that the loss of services claim is limited to 9.5 years after the accident, during which time Mr. and Mrs. Saladino were

married and still living together. (AA Mem. at 32; Pl. Opp. at 28). Indeed, this Court instructed the jury that its award "must be strictly limited to that time period." (Tr. 990).

As AA notes, few New York courts have commented on this element of damages in the context of a paralytic injury. (AA Mem. at 33). Both sides discuss Bissell, 56 A.D.3d 1144, in which the court reduced an aggregate loss of consortium award to $1 million for the spouse of a paraplegic plaintiff, $250,000 of which was designated for 5.25 years of past damages. Although the jury awarded Mrs. Saladino a greater amount for past damages in this case, the period covered is more than nine years, her husband has greater paralysis, and the loss she suffered to the marriage – the marriage itself – arguably is more significant. Indeed, counsel for AA suggested to jurors in his summation that $500,000 (double the past award in Bissell) would be "appropriate." (Tr. 920).

The trial record established that Mr. Saladino was the primary wage-earner, yet also completely involved in caring for the children when his wife went to work each afternoon. Mr. and Mrs. Saladino had a partnership, in every sense of the word. Following the accident, Mrs. Saladino was out of work for more than two years and ultimately became solely responsible for work, children, and the house. After nearly a decade, the stress of constant care, recognition of permanent disabilities, and the inability to experience martial intimacy ultimately led to Mr. Saladino's separation from the family. In light of these facts, this Court concludes that $750,000 for loss of consortium does not deviate materially from reasonable compensation.

### 3. Future Medical Expenses

In this case, the jury awarded Mr. Saladino $18 million in future health care expenses. (Tr. 1001). Although the same § 5501(c) standard applies, "a trial court's review of jury awards

for economic damages entails different considerations" because, unlike damages for pain and suffering, medical expenses are "based on calculations, assumptions, and tangible information." Okraynets, 555 F. Supp. 2d at 451. A court therefore must examine whether the jury award "closely approximate[s] the . . . evidence presented at trial; this is an approach that departs from the significantly greater deference accorded the more nebulous pain and suffering awards." Marcoux, 290 F. Supp. 2d at 479. "It is well settled that an award for future medical expenses may not be based upon mere speculation." Faas v. State of New York, 249 A.D.2d 731, 732 (3d Dep't 1998). A plaintiff "must establish future medical expenses with reasonable certainty, offering competent proof of necessary, anticipated medical costs." Haleemeh M.S. ex rel. Mohammad S.F. v. MRMS Realty Corp., 28 Misc.3d 443, 462 (N.Y. Sup. 2010) (internal quotation marks and citations omitted).

AA asserts that the $18 million award materially deviates from reasonable compensation under § 5501(c), though it concedes that courts in this context must also assess whether "the amount of future medical expenses is supported by evidence." (AA Mem. at 31-32; AA Reply at 17). Notably, S&S does not dispute this award. Additionally, no party disputes the jury's determination that Mr. Saladino has a life expectancy of 24 years.

At trial, however, Mr. Saladino's life expectancy and the proportion of nursing care (as opposed to less-skilled health aid care) appropriate for his condition were subjects of intense debate. The parties had ample opportunity to examine and cross-examine expert witnesses as to their findings in all of these areas. Assuming Mr. Saladino would live to age 66, defense experts plotted out future costs of $8,040,680, using their own life care plan. (Tr. 797). Yet, during their summations, both AA and S&S suggested that $10 million would be appropriate. (Tr. 917, 951).

In contrast, Plaintiffs' expert, who prepared a year-by-year chart, testified that the total future cost would be $23,096,487 to age 76.5; $13,715,347 to age 68.5; and $11,800,000 to age 66.5. (Tr. 98, 126).

As noted, the jury found Mr. Saladino's life expectancy to be 24 years. (Tr. 1002). It also was well within the province of the jury to determine that Mr. Saladino should continue with his current life care plan, credited by both sides for maintaining his level of health, (see, e.g., Tr. 280-81, 569-70, 573-574), rather than reducing the hours of nurse support or changing agencies. The jury's award of $18 million for future medical costs is supported by evidence of his current life care plan, as well as the year-by-year breakdown provided by Plaintiffs' expert. (Pl. Ex. 37A, Tr. 98). In fact, AA does not claim in its motion that the jury's findings are unsupported. Instead, it focuses exclusively on comparisons to other cases under § 5501(c). Even so, AA concedes that in two New York cases brought by quadriplegic patients, the courts sustained future health care costs of at least $14 million. (AA Mem. at 31 (citing Auer v. State, 289 A.D.2d 626 (3rd Dep't 2001) and Schifelbine v. Foster Wheeler Corp., 3 Misc.3d 151 (N.Y. Sup. 2002)). In Schifelbine and Auer, the plaintiffs had longer life expectancies than Mr. Saladino, but other factors, such as increased health care costs over time, could contribute to a higher award in this case. (See Tr. 94-98, 798). Moreover, "[w]hen it comes to future medical needs and household-related expenses, every case is different." Okraynets, 555 F. Supp. 2d at 452. This Court therefore concludes that $18 million for future health care costs is supported by the evidence adduced at trial and does not deviate materially from reasonable compensation.

## B. Improper Summation Claim

Defendant AA also moves for a new trial on the basis that Plaintiff's "unreasonable and unfair summation demand impacted the excessive [pain and suffering] figure awarded by the jury." (AA Mem. at 30). As an initial matter, this Court already has determined that the jury's award was not excessive. Moreover, in deciding "whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury," Strobl v. New York Mercantile Exchange, 582 F. Supp. 770, 780 (S.D.N.Y. 1984), "[g]reat discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the conduct of counsel on the jury," Johnson v. Celotex Corp., 899 F.2d 1281, 1289 (2d Cir. 1990). Notably, while the Second Circuit "disfavor[s]" permitting counsel to suggest specific pain and suffering dollar amounts to the jury, there is no per se rule prohibiting it. Tatum v. City of New York, No. 06-cv-4290 (PGG)(GWG), 2009 WL 1748044, at *7 (S.D.N.Y. June 19, 2009) (quoting Consorti v. Armstrong World Indus., Inc., 72 F.3d 1003, 1016 (2d Cir. 1995)). Indeed, the Second Circuit has committed the decision "to the discretion of the trial judge, who may either prohibit counsel from mentioning specific figures or impose reasonable limitations, including cautionary jury instructions." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 912 (2d Cir. 1997).

In this case, AA contends that Plaintiffs' counsel improperly influenced the jury in his summation by suggesting that Mr. Saladino receive $15 million for 11 years of past pain and suffering and $25 million for 25 years of future pain and suffering. (Tr. 905, 906). AA's argument fails for three reasons. First, this Court previously considered and denied AA's motion

in limine to bar Plaintiffs from recommending a lump sum dollar amount for non-economic damages. (See Tr. of Pre-Trial Conf., dated June 28, 2010, at 25).

Second, both defense attorneys in their own summations called the jury's attention to what they viewed as unreasonable pain and suffering suggestions. Counsel for AA stated that, "as tempting as it might be as caring, feeling human beings, you cannot allow sympathy for this very nice, very damaged man to affect what you do in any category of compensation, particularly, an award for pain and suffering." (Tr. 929). Moreover, he suggested that Plaintiffs' counsel had introduced a video at trial in support of "an award that I submit to you he hoped would be fueled by the sympathy and passion evoked by watching part of a day in the life of Mr. Saladino." (Tr. 931). S&S's counsel also directed the jury's attention to the "huge" and "outrageous" numbers suggested by Plaintiffs' counsel, stating that they "are lawyer's numbers, not testimony numbers," and "[t]here is no evidence in the case about what an appropriate number is for pain and suffering." (Tr. 917). Ultimately, AA's counsel suggested an aggregate pain and suffering award of $5 million, split evenly between past and future damages. (Tr. 932). It is worth noting that the jury's $15 million pain and suffering award is far closer to AA's figure than the $40 million aggregate sum Plaintiffs' counsel suggested.

Third, this Court gave the jury a limiting instruction on the issue of damages, cautioning, inter alia, that statements by lawyers are not evidence; that it is the jury's function to determine the sum of money, if any, that will fairly and reasonably compensate the plaintiffs for pain and suffering; and that jurors must rely on their common knowledge "without favor, without sympathy, and without any precise formula." (Tr. 980, 984). See also Hamilton v. Garlock, Inc., 96 F. Supp. 2d 352, 356 (S.D.N.Y. 2000) (denying motion for new trial because counsel

conceded his numbers meant nothing and "specific instruction was given to the jury in keeping with the Second Circuit's more recent pronouncements on the subject"). Accordingly, AA's motion for a new trial on the basis of improper summation comments is denied

## III. CONCLUSION

For the reasons set forth above, Defendants' motions for a new trial (Docket Nos. 211, 214) are denied on all grounds. The parties are directed to file a joint proposed Judgment within 30 days of this Order. If the parties cannot reach an agreement, they are to file a joint letter to that effect and the Court will hold a hearing pursuant to New York CPLR § 4545 and Article 50-B to discuss collateral source and structuring issues.

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
January 25, 2011